**IN UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE<br><br>CHINA VALVES TECHNOLOGY SECURITIES LITIGATION<br><br>This paper applies to:    ALL CASES | Master Docket No.<br>11 Civ. 0796 (LAK) |

**DECLARATION OF WILLIAM B. FEDERMAN IN SUPPORT OF (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND (II) PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, <u>AND REIMBURSEMENT AWARDS</u>**

I, William B. Federman, under penalty of perjury, hereby declare:

1.      I am an attorney duly licensed to practice law in several states including New York and am admitted to practice in numerous federal courts including the United States District Court for the Southern District of New York.  I am the managing partner of the law firm Federman & Sherwood, Lead Counsel in this litigation.  I submit this Declaration in support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and Motion for an Award of Attorneys' Fees and Reimbursement of Expenses and Reimbursement Awards to Plaintiffs.[1]  These motions and memoranda in support are filed concurrently herewith.  I have personal knowledge of the matters set forth herein concerning all matters pertaining to this Litigation and, if called upon, I could and would competently testify thereto.

2.      The purpose of the Declaration is to set forth the nature of the extensive litigation and negotiations that led Plaintiffs and Lead Counsel to agree to the Settlement of this Litigation between the Parties.[2]  This Declaration demonstrates why the Settlement is fair, reasonable and adequate and should be approved by the Court, why the plan of allocation is fair and reasonable, why Lead Counsel's fee and expense request is reasonable and should be approved by the Court, and why the request for a reimbursement award to Plaintiffs should be approved by the Court.

## I.      SUMMARY

3.      Since its commencement, Plaintiffs and Lead Counsel have litigated this Litigation vigorously.  The Settlement was reached only after Lead Counsel: (1) reviewed and analyzed thousands of pages of documents, including China Valves' public filings, annual reports, press

---

[1] The term "Plaintiffs" is used herein to refer to Lead Plaintiff Bristol Investment Fund, Ltd. and named plaintiff Joseph Gibbons.

[2] All capitalized terms not otherwise defined have the meaning set forth in the Stipulation and Agreement of Settlement, dated April 28, 2014 (the "Stipulation"), filed with the Court on April 30, 2014 (Dkt. No. 108-1).

releases, transcripts of earnings calls, and other public statements; (2) conducted a factual investigation, which included an investigation in China of the Company's records with the Chinese State Administration for Industry and Commerce ("SAIC"); (3) researched applicable complicated generally accepted accounting principles ("GAAP") and Securities and Exchange Commission ("SEC") rules and regulations; (4) prepared and filed a motion and briefs in support, which requested substituted service for the individual defendants located in China who were unwilling to allow China Valves' counsel to accept service on their behalf; (5) prepared and filed a comprehensive 126-page Consolidated Class Action Complaint; (6) prepared and filed extensive briefing in opposition to Defendants' motion to dismiss and a motion to dismiss filed by Moore Stephens Wurth Frazer and Torbet, LLP Frazer Frost, LLP ("Auditor Defendants" or "Moore Stephens"); (7) researched and drafted a 163-page Amended Consolidated Class Action Complaint, which included new facts concerning the Company's related-party transaction involving Changsha Valve and the investigation into possible Foreign Corrupt Practices Act ("FCPA") violations at Changsha Valve; (8) prepared and filed extensive briefing in opposition to Defendants' and Auditor Defendants' second motions to dismiss; (9) advised and consulted with Plaintiffs throughout this proceeding; (10) consulted with an experienced damages and stock market efficiency financial expert; (11) coordinated with Defendants and Plaintiffs regarding discovery; (12) researched and prepared a detailed mediation statement, which included a damages analysis prepared by Plaintiffs' financial expert; and (13) reviewed and analyzed Defendants' mediation statement, including Defendants' insurance policy and statements by Defendants' insurance carrier regarding coverage.

4.    Moreover, the Settlement was reached after intense, concentrated and good faith, negotiations among counsel with the aid and oversight of JAMS mediator Jed D. Melnick, Esq.

The Parties turned to Mr. Melnick as a very experienced mediator in similar complex securities class action lawsuits.  The settlement negotiations included multiple telephone conferences between the Parties, the Parties' exchange of extensive mediation documents including an expert damages analyses and a copy of Defendants' insurance policy, and an all-day mediation session between the Parties on February 4, 2014 before Jed D. Melnick.  By the time the Settlement was reached, Plaintiffs and Lead Counsel had gained a full understanding of the strengths and weaknesses of the Litigation.

5.     Notices of the Settlement were sent to more than 13,500 Class Members and nominees, and notice was duly published in the *Investor's Business Daily*.  To date, not a single Class Member has objected to the Settlement, Plan of Allocation, the request for attorneys' fees and expenses, or the requested awards to Plaintiffs.  *See* Affidavit of Tina Chiango Regarding (A) Mailing of the Notice and Proof of Claim, (B) Publication of the Summary Notice, and (C) Report on Requests for Exclusion and Objections, ("Chiango Affidavit") attached hereto as Exhibit 1, ¶ 15.  Additionally, as of the filing of this declaration, no Class Members have sought exclusion from the Settlement.  *Id*.

6.     The Settlement confers an immediate and substantial benefit on the Class.  At the same time, the certainty of the Settlement eliminates the very real risk that continued litigation against the Defendants might yield nothing for the Class in light of: (1) the risk that Plaintiffs would not be able to obtain certification of the Class; (2) the serious difficulties that the Class will face in establishing falsity, scienter, loss causation, and damages, and the uncertainty of presenting these and other issues to a jury; and (3) the risks of enforcing a judgment against Defendants.  The Settlement avoids these landmines and provides for an immediate and substantial recovery for the Class.

7.      For the reasons set forth herein and in the accompanying memoranda, this Court should find that the Settlement, Plan of Allocation, request for attorneys' fees and expenses, and request for reimbursement awards to Plaintiffs are fair, reasonable, adequate and should be approved.

## II.     PROSECUTION OF THE LITIGATION

### A.  Overview of Allegations

8.      The Litigation brings claims under Sections 11, 12, and 15 of the Securities Act of 1933 ("Securities Act") on behalf of purchasers of China Valves' common stock pursuant and/or traceable to China Valves' Registration Statement effective December 14, 2009 and prospectuses issued in connection with same; and under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of purchasers of the publicly traded common stock of China Valves Technology, Inc. ("China Valves" or the "Company"), during the period of December 1, 2009 through January 13, 2011, inclusive (the "Class Period").[3]  In its Memorandum Opinion issued on October 21, 2013 (Dkt. No. 102), the Court limited Plaintiffs' Securities Act claims to purchasers of China Valves' common stock pursuant or traceable to the Company's prospectus issued in connection with its offering of stock on January 5, 2011; and their Exchange Act claims to purchasers of China Valves' common stock from January 12, 2010 to November 18, 2010.

9.      The factual allegations in this Litigation are set forth at length in the Amended Consolidated Class Action Complaint.  Dkt. No. 83.  Plaintiffs allege that Defendants made material misrepresentations or omissions in violation of the federal securities laws.  In particular,

---

[3] The Complaint named the following defendants: China Valves, Siping Fang, Jianbao Wang, Gang Wei, Renrui Tang, Ichi Shih, Binjie Fang, Zengbiao Yu, Peter Li, William Haus, Bin Li, Moore Stephens Wurth Frazer and Torbet, LLP Frazer Frost, LLP.

4

Plaintiffs allege that Defendants improperly failed to disclose material facts concerning the related-party nature of two of the Company's acquisitions (Hanwei Valve and Changsha Valve) and a third transaction concerning a loan to defendant Binjie Fang.  Plaintiffs further allege that Defendants improperly failed to disclose material facts concerning the FCPA investigation pending against Changsha Valve, and materially overstated the Company's financial results in the registration statement made effective on December 14, 2009 (the "Registration Statement") and in the subsequent prospectus supplements.  As a result of Defendants' false or misleading statements, Plaintiffs allege, China Valves' stock traded at artificially inflated prices during the Class Period. Plaintiffs allege that the material misrepresentations made by Defendants during the Class Period were revealed in two corrective disclosures: first, in a partial corrective disclosure on November 18, 2010 when the Company filed an amended Form 8-K; and second, in a fully corrective disclosure on January 13, 2011 when a report was published by Citron Research critical of China Valves and calling into question into question the subject transactions.

### B. Procedural History

10.     On February 4, 2011, a class action complaint was filed by plaintiff Donald Foster, individually and on behalf of all others similarly situated, against China Valves, Siping Fang, Jianbao Wang, Gang Wei, Renrui Tang, and Ichi Shi [sic], alleging violations of the federal securities laws.  On February 17, 2011, a class action complaint was filed by plaintiff Greg London, individually and on behalf of all others similarly situated, against the same defendants.  On March 8, 2011, a class action complaint was filed by plaintiff Elliot Greenberg, individually and on behalf of all others similarly situated, against the same defendants.  Each of these actions alleged claims under Sections 10(b) and 20(a) of the Exchange Act.

11.     By Order dated June 29, 2011, the Court (i) consolidated the above actions, (ii) appointed Bristol Investment Fund, Ltd. ("Bristol Investment") as Lead Plaintiff, and (iii) approved Federman & Sherwood and The Ball Law Firm LLP as Lead Counsel.  *See* Dkt. No. 34.

12.     On August 29, 2011, Bristol Investment filed a Consolidated Class Action Complaint ("Consolidated Complaint") against China Valves, Siping Fang, Jianbao Wang, Gang Wei, Renrui Tang, Ichi Shih, Binjie Fang, Zengbiao Yu, Peter Li, William Haus, and Bin Li, and China Valves' auditors, Moore Stephens, alleging violations of the federal securities laws.   In particular, Bristol Investment alleged violations of Sections 11, 12, and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act and Rule 10-b promulgated thereunder.  Dkt. No. 42

13.     On September 12, 2012, the Court issued a Memorandum Opinion ("First Opinion"), dismissing the Consolidated Complaint without prejudice to the filing of an amended consolidated complaint by September 26, 2012.  Dkt. No. 81.

14.     On September 26, 2012, Lead Plaintiff Bristol Investment and added named Plaintiff Joseph Gibbons ("Gibbons") filed an Amended Consolidated Class Action Complaint ("Amended Complaint") against the same Defendants and alleging the same claims as in the Consolidated Complaint.  Dkt. No. 83.  The Amended Complaint contained new information with respect to, *inter alia*: (i) correspondence between the SEC and China Valves regarding questions that the SEC posed to China Valves regarding the Company's acquisition of Changsha Valve; (ii) the materiality of related-party transactions, including the Changsha Valve acquisition; (iii) the materiality of Changsha Valve's possible FCPA violations; (iv) financial reporting requirements in China; and (v) the differences and similarities between the Company's reporting requirements

in the U.S. and China.

15.    On October 21, 2013, the Court issued a Memorandum Opinion ("Opinion"), dismissing some claims and permitting others to proceed.  Dkt. No. 102.  In particular, the Court dismissed:  (i) all claims that the Company materially overstated its financial results, (ii) all claims relating to the Hanwei Valve transaction, (iii) all claims relating to the Binjie Fang loan, (iv) all claims based on the Company's statement that it was negotiating with a Big Four accounting firm to take over as auditor, (v) all of Bristol Investment's Securities Act claims regarding the related-party nature of the Changsha Valve transaction, (vi) all Section 10(b) claims based on the FCPA investigation into Changsha Valve, (vii) all claims against Bin Li, (viii) Gibbons' Section 20(a) claim against Gang Wei, and (ix) Bristol Investment's Section 11 claim against Jianbao Wang. The Court further decided that China Valves' Form 8-K/A, filed on November 18, 2010, constituted, in effect, a fully corrective disclosure with regard to the alleged related-party nature of the Changsha Valve transaction.  The Court also dismissed all claims against the Auditor Defendants.  The Court permitted the following claims to proceed:  (i) Bristol Investment's Sections 11, 12, and 15 claims based on the Company's alleged failure to disclose that Changsha Valve was under investigation for possible FCPA violations; and (ii) Gibbons' Sections 10(b) and 20(a) claims based on the Company's alleged failure to disclose the alleged related-party nature of the Changsha Valve transaction.

16.    On November 22, 2013, the Parties conducted a Rule 26 discovery conference.  The Parties filed a Joint Preliminary Report and Discovery Plan on December 3, 3013.

## C.  Financial Expert

17.    Because of the complex allegations in this Litigation, Lead Counsel retained and worked with Candace L. Preston, CFA, and Cynthia L. Jones, CFA, of Financial Markets Analysis,

LLC (collectively "FMA"), as financial experts and consultants during the course of the Litigation. Lead Counsel worked with FMA as it developed and prepared a damage analysis (provided to Defendants and mediator Jed. D. Melnick), which, *inter alia*, considered whether China Valves shares operated in an efficient market and estimated aggregate damages.  The consultations with FMA aided Lead Counsel in preparing for mediation and assessing the aggregate damages and prospects of obtaining class certification.

### D.  Settlement Negotiations

18.     The Settlement was reached only after Lead Counsel and Plaintiffs had a very good understanding of the factual and legal issues in this Litigation.  As noted above, Lead Counsel had reviewed numerous China Valves documents and had conducted a substantial investigation — which included an investigation in China — before coming to an agreement to settle.  Moreover, the Settlement came after the Parties had fully briefed Defendants' motion to dismiss, which included Defendants' key challenges to Plaintiffs' case, and after the Court had issued its Opinion on Defendants' motion, substantially narrowing Plaintiffs' claims.  Indeed, Lead Counsel and Plaintiffs adequately vetted the merits of the claims and defenses through consideration of the numerous pleadings and briefs, the documents filed with the SEC and SAIC, consultations with Plaintiffs' financial expert, mediation submissions, and candid discussions with Defendants' counsel and well-respected and experienced JAMS mediator Jed D. Melnick concerning the strengths and weaknesses of the Litigation, the difficulty — if not impossibility — of enforcing a judgment in China, and the limited wasting amount of insurance funds available to fund a settlement.

19.     In November 2013, following the Court's October 21, 2013 Opinion, the Parties began discussions regarding discovery.  During these discussions, counsel for Defendants' advised

Lead Counsel for Plaintiffs that there was a strong possibility that Defendants would no longer fund a defense of the Litigation.  In particular, defense counsel expressed that there was a 50/50 chance that the Sidley Austin LLP firm would be forced to withdraw as counsel for Defendants by January 2014 based on uncertainties as to continued legal payments.  As defense counsel explained, Defendants viewed themselves as effectively "judgment proof" based on their presence in China and the unlikelihood that the Chinese government would enforce a judgment against them.  Defense counsel further advised that: (i) the directors and officers' ("D&O") insurance policy had a $5 million limited; (ii) the insurance carrier (based in Hong Kong) was disputing coverage and was therefore only willing to commit $2.5 million (half of the policy limit) to the Litigation; (iii) defense counsel's fees had already reached $1.4 million; (iv) the proceeds available under the insurance policy were nearly depleted; (v) given the ongoing SEC investigation, it was unlikely that anything more than $1 million would be available to fund a possible recovery to Plaintiffs and the Class; (vi) should Sidley Austin LLP be forced to withdraw as counsel for Defendants, it was highly unlikely that Defendants would retain new counsel; and (vii) in light of the very real possibility that Sidley Austin LLP would be forced to withdraw as counsel, the best and perhaps only opportunity for Plaintiffs to secure a recovery for the Class would be if a settlement could be negotiated by early 2014.

20.    From November 2013 through January 2014, the Parties conferred multiple times in an attempt to reach common ground to negotiate a settlement.  On February 4, 2014, the Parties conducted a full day in-person mediation session, which utilized the services of experienced JAMS mediator Jed D. Melnick.  A representative for Defendants' insurance carrier participated in the mediation session.

21.     In preparation for the mediation conference, Lead Counsel: (a) reviewed and researched various arguments made by Defendants in connection with Defendants' motion to dismiss; (b) consulted with and advised Plaintiffs; (c) consulted with their financial expert; (d) reviewed the damages analysis prepared by Plaintiffs' financial expert; (e) reviewed Defendants' insurance policy and letters from the insurance carrier in which the carrier claimed that it was not required to cover the costs of the Litigation due to policy restrictions; and (f) prepared and exchanged extensive mediation documents, including the analysis from Plaintiffs' financial expert.

22.     At the February 4, 2014 mediation session, Lead Counsel engaged in vigorous arm's-length negotiations with Defendants and their insurers with the aid and oversight of JAMS mediator Jed D. Melnick.  The negotiations concerned, *inter alia*, issues of law and fact regarding the claims and defenses in the Litigation, insurance coverage issues, collectability issues, and damages.  Ultimately, the Parties agreed to a Settlement of $1.5 million in cash.

23.     Thereafter and continuing through April 28, 2014, the Parties continued their negotiations of the Settlement terms and prepared the paperwork to document the Settlement and the notice materials.  On April 30, 2014, the Stipulation of Settlement was filed with the Court. Dkt. No. 108-1.

24.     On May 1, 2014, the Court certified the Settlement Class for purposes of effectuating the Settlement, appointed Plaintiffs as class representatives, approved the appointment of Heffler Claims Group as claims administrator, approved the form and substance of the proposed notice of Settlement, directed that notice of the Settlement be provided to Class Members, and set a briefing schedule and hearing regarding final approval of the Settlement (the "Order Providing Notice").  *See* Dkt. No. 109.

### E.  Lead Counsel's Continuing Commitment to the Class

25.     Even after the Settlement was reached, Lead Counsel has continued its commitment to the Class.  In furtherance of Lead Counsel's dedication to maximizing the recovery for Class Members, Lead Counsel spent time and effort soliciting bids from claims administrators, and negotiating reasonable rates for claims administration services.   Moreover, Lead Counsel continues to coordinate with Heffler Claims Group on at least a bi-weekly basis to ensure that Class Members' questions about the Settlement are effectively and promptly answered.  Working with Lead Counsel, Heffler Claims Group established and maintains a toll-free telephone call center for Class Members to call and obtain information about the Settlement, request a Notice package, and/or seek assistance from a live operator.

### III.    THE NOTICE TO CLASS MEMBERS SATISFIES DUE PROCESS

26.     Following preliminary approval, Lead Counsel instructed Heffler Claims Group to begin disseminating copies of the Settlement Notice and proof of claim form by mail in accordance with the Order Providing Notice.  As set forth in the Affidavit of Tina Chiango, nearly 13,500 copies of the Notice and Proof of Claim form have been mailed to potential Class Members and their nominees.  *See* Chiango Affidavit (Ex. 1) at ¶¶ 5-10.  An additional 90 copies of the Notice and Proof of Claim form have been provided to banks and other institutions.  *Id.* at ¶ 6.

27.     In accordance with the Order Providing Notice, on June 13, 2014, Heffler Claims Group caused the Summary Notice to be published in the national edition of *Investor's Business Daily*.  *Id.* at ¶ 14.  Heffler Claims Group has also established a dedicated settlement website, *www.China ValvesSettlment.com*, to provide potential class members with information concerning the Settlement, including the date and time of the final approval hearing, and access to

downloadable copies of the Notice and Proof of Claim form, as well as copies of the Stipulation of Settlement. *Id.* at ¶ 11.

28.     The Court-approved Notice explains the background and terms of the Settlement and provides potential members of the Class with the date of the final approval hearing.  The Notice provides Class Members with a detailed explanation of the Settlement, the Plan of Allocation, the anticipated fee and expense requests, and the rights and options of Class Members. *See* Ex. A to the Chiango Affidavit.  This Notice complies with the requirements of the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act ("PSLRA"), and due process, and it is similar to procedures approved in other cases.

29.     The Notice and Summary Notice advised Class Members that they could object, no later than August 5, 2014, to the Settlement, the Plan of Allocation, and/or the requested attorneys' fees and expenses and reimbursement award to Plaintiffs.  Class Members were further informed that they could exclude themselves from the Class on or before August 5, 2014.  *See* Exs. A and B to the Chiango Affidavit.  The Notice provided Lead Counsel's estimates of what the recovery represents per share with and without the requested attorneys' fees and expenses and awards to Plaintiffs.  There were no undisclosed assumptions in these calculations and the calculations were made in consultation with Plaintiffs' damages experts.  *Id.*

## IV.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

30.     The proposed Settlement now before the Court provides for a recovery for the Class certified in the Court's May 1, 2014 order of $1.5 million in cash, in exchange for the dismissal of all claims that were or could have been asserted against Defendants in the Litigation. If the Settlement is approved and becomes final, Defendants have no right to the return, recovery or

reversion of any portion of the Settlement Fund.  The Settlement Fund has been placed in an escrow account and is earning interest for the benefit of the Class.

31.     Plaintiffs believe they could have prevailed on the merits of their claims against Defendants.  Defendants were just as adamant that Plaintiffs would fail.  Having considered the foregoing — and evaluating Defendants' defenses, the insurance funds available, and the bleak prospect of enforcing a judgment in China — it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed $1.5 million Settlement is fair, reasonable and adequate, and in the best interests of the Class.  At minimum, the Settlement appropriately balances the risks, costs, and delays inherent in complex cases, falls within the range of reasonableness, and warrants approval.

32.     Lead Counsel's endorsement of the Settlement is informed by the thorough understanding of the strengths and weaknesses of the claims and defenses in the Litigation gained through their extensive and rigorous prosecution of this matter, as described above.  Lead Counsel additionally considered: (i) the cash benefit to Class Members under the terms of the Stipulation; (ii) the difficulties and risks involved in proving the complex claims, such as the falsity and materiality of the alleged misstatements and omissions, scienter, and loss causation; (iii) the possibility that the Court would not certify (or would severely curtail) Plaintiffs' proposed class; (iv) the likelihood of defeating Defendants' probable summary judgment motion and any *Daubert* motion, and ultimately prevailing at trial; (v) the attendant risks of litigation, especially in a complex action such as this; (vi) the delays inherent in such litigation, including appeals; (vii) the uncertainty of whether Plaintiffs could prove damages and in what amount, even assuming that

Plaintiffs could establish Defendants' liability; and (viii) the uncertainty of collecting a judgment against Defendants in China.

33.    Securities class actions are by their nature legally and factually complex and difficult.  This case was no exception.  Moreover, Defendants raised a host of complex factual and legal challenges increasing the uncertainty of a favorable outcome absent settlement.  *See* Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Proposed Class Action Settlement and Approval of Plan of Allocation, filed contemporaneously herewith, at 8-11, 14-18.

34.    Presenting the claims to a jury would have involved enormous time, expense, complexity and risk. Trial would have involved numerous witnesses and dozens of exhibits. Resolution of the expert issues alone could have required substantial *Daubert* hearings as well as lengthy pre-trial hearings.  Whether Plaintiffs were able to establish numerous elements of proof – including falsity and scienter – and whether Plaintiffs could establish loss causation would likely have come down to inherently unpredictable and hotly disputed "battles of the experts."  Even if liability were established at trial, there was a real risk that, after a trial of the Litigation, the Class would have recovered an amount less than the Settlement Amount – or even nothing at all. Moreover, jury reactions to Plaintiffs' evidence (and the Defendants' responses thereto) on the types of complex issues in this case are inherently difficult to predict.

35.    Even riskier than establishing liability and damages at trial was the prospect of enforcing and collecting a judgment in China.  All Defendants, including China Valves, are based in China, with the exception of defendant Haus (an outside director) who was unemployed at the time of the Settlement.  Moreover, China Valves held a small $5 million primary insurance policy, and the insurance carrier (located in Hong Kong) disputes coverage of some of the claims in the

14

Litigation.[4]  Thus, under a reservation of rights, the carrier was only willing to recognize half of the policy as being available to satisfy the claims and defense costs arising from the Litigation. Because both Defendants and the insurance carrier were located in Hong Kong, there was little incentive for Defendants and the carrier (who disputed coverage) to continue to defend against the Litigation since a U.S. judicial order would almost certainly not be enforced.  Indeed, immediately before settlement negotiations began, counsel for Defendants explained to Lead Counsel that there was a strong likelihood that Sidley Austin LLP would soon withdraw as counsel for Defendants due to uncertainty of whether defense costs would be paid.  Had Defendants discontinued defending the Litigation, it is extremely likely that Plaintiffs would have recovered nothing for the Class.

36.    Of the $2.5 million in the policy that the carrier was willing to apply to the Litigation, defense costs and expenses had already exceeded $1.4 million at the time of Settlement. Thus, the $1.5 million Settlement exhausted the remaining insurance proceeds that were undisputed and required the carrier to put forward additional funds despite its disputed coverage and reservation of rights.  Accordingly, the $1.5 million Settlement Amount represents virtually all of the cash that the Class could have possibly recovered.  Moreover, the Settlement represents approximately 14% of the estimated maximum damages, as determined by Plaintiffs' financial experts.[5]  A 2014 report by Cornerstone Research entitled "Securities Class Action Settlements: 2013 Review and Analysis" ("Cornerstone Report") determined, based on an analysis of cases settled in 2013, that the median settlement for securities class actions was 2.1% of the total

---

[4] Defendants' secondary insurance policy wholly denied coverage of the claims raised in the Litigation.

[5] Plaintiffs' damages experts estimated maximum class-wide damages to be $10.8 million.  Had Defendants retained an expert, as they would have had the Litigation not been settled, their expert would almost certainly have arrived at a lower estimate of damages.

estimated damages.  *See* Cornerstone Report at 8, attached hereto as Exhibit 2.  The Cornerstone Report further found that in 2013 the median securities class action settlement was 15.1% of estimated damages in cases with estimated damages less than $50 million, and that from 1996 through 2012 the median securities class action settlement was 10.7% of estimated damages in cases with estimated damages less than $50 million.  *See id.* at 9.  The Settlement is therefore favorable when compared with other securities class action settlements, despite the unique challenges of this Litigation.   Indeed, the Cornerstone Report additionally explained that "settlements of Chinese reverse merger cases" were "relatively small" with all but one of fourteen such cases settling for less than $10 million.  *Id.* at 2.

## V.     THE PLAN OF ALLOCATION IS FAIR AND SHOULD BE APPROVED

37.     The Settlement Fund will be distributed in accordance with the proposed Plan of Allocation. The objective of the Plan of Allocation is to equitably distribute the net proceeds of the Settlement Fund to those Class Members who suffered losses as a result of the alleged misrepresentations and omissions.  The proposed Plan of Allocation was prepared in consultation with Plaintiffs' financial experts with FMA, who were familiar with the factual and legal issues in the litigation.  There have been no objections filed to the Plan of Allocation.

38.     The Plan of Allocation reflects the remaining allegations that Defendants made materially untrue and misleading statements and omissions resulting in violations of the Securities Act and the Exchange Act, and opinions of Plaintiffs' experts on the damages that were caused by the alleged disclosures and omissions of Defendants.  The objective of the Plan of Allocation is to equitably distribute the Settlement proceeds to Class Members who suffered economic losses caused by the alleged violations of the federal securities laws, as opposed to losses caused by factors unrelated to the alleged violations of law.

39.     The Plan of Allocation is consistent with Plaintiffs' allegations and Plaintiffs' expert's findings that investors who purchased shares of China Valves stock during the Class Period were damaged by Defendants' failure to, *inter alia,* fully disclose material facts relating to China Valves' acquisition of Changsha Valve.  An Authorized Claimant's Recognized Loss will be based upon the dates of purchase and sale, if any, in correspondence with the declines in the stock price of China Valves that were found to be reasonably attributable to the misstatements alleged in the Amended Complaint.  The Recognized Loss formula is not intended to be an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement.  The Recognized Loss formula is simply the basis upon which the Net Settlement Fund will be proportionately allocated to Authorized Claimants.

40.     Lead Counsel respectfully submit that the Plan of Allocation is fair, reasonable and adequate, and should be approved by the Court.

## VI.    THE ATTORNEYS' FEES AND EXPENSES ARE FAIR AND REASONABLE

41.     The Notice mailed to the members of the Class stated that Lead Counsel would apply for an award of attorneys' fees not to exceed 30% of the $1.5 million Settlement Fund, including any accrued interest.  The Notice further stated that Lead Counsel would request reimbursement of expenses incurred and advanced by Lead Counsel in prosecuting this litigation not to exceed $65,000.  Lead Counsel is applying for fees of 30% of the Settlement Fund (plus interest), and is seeking reimbursement of out-of-pocket litigation expenses of $53,973.57.   The requested fee award of $450,000 would result in a negative multiplier of 0.46 of Lead Counsel's lodestar of $978,292.50 in this Litigation.

**A. Attorneys' Fees**

42.     The work undertaken by Lead Counsel in prosecuting this case and arriving at the Settlement in the face of substantial risks has been time-consuming and challenging.  Lead Counsel conducted an extensive investigation into the underlying facts; researched and prepared a detailed complaint; briefed Defendants' motions to dismiss the complaint; researched and prepared an amended complaint; briefed Defendants' motions to dismiss the amended complaint; consulted with financial experts; engaged in settlement negotiations with experienced defense counsel and insurers; and prepared numerous papers reflecting the Settlement and providing for Notice to the Class.

43.     Lead Counsel prosecuted this case on a contingency basis, committed substantial resources to the matter, advanced significant expenses without guarantee of reimbursement, and litigated it without any compensation or guarantee of success or payment.  Based on the result achieved for the Class, the extent and quality of work performed, the risks of the litigation and the contingent nature of the representation, Lead Counsel submit that a 30% fee award ($450,000) is fair and reasonable and should be approved.

44.     The chart below sets forth Lead Counsel's lodestar.  The lodestar summary was prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel, which are available at the request of the Court.

From Inception to July 31, 2014

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| William B. Federman | (A) | 248.15 | $850 | $210,927.50 |
| Stuart W. Emmons | (A) | 617.60 | $675 | $416,880.00 |
| Amy H. Wellington | (A) | 77.60 | $450 | $34,920.00 |
| Jennifer S. Montagna | (A) | 1.25 | $450 | $562.50 |
| Jennifer F. Sherrill | (A) | 51.50 | $450 | $23,175.00 |

| Sara E. Collier | (A) | .30 | $450 | $135.00 |
|---|---|---|---|---|
| Josh D. Wells | (A) | 6.00 | $450 | $2,700.00 |
| A. Brooke Murphy | (A) | 616.75 | $400 | $246,700.00 |
| K. Lynn Nunn | (PL) | 28.67 | $250 | $7,167.50 |
| Robin K. Hester | (PL) | 71.50 | $250 | $17,875.00 |
| Jenny M. Johnston | (PL) | 26.75 | $250 | $6,687.50 |
| Judy A. Berry | (PL) | 3.50 | $250 | $875.00 |
| Frandelind V. Shoals | (PL) | 5.05 | $250 | $1,262.50 |
| Barak G. Federman | (PL) | 33.70 | $250 | $8,425.00 |
| **TOTAL:** | | **1788.32** | | **$978,292.50** |

(A) Attorney
(PL) Paralegal

45.     As indicated above, in prosecuting this Litigation, Lead Counsel expended 1,788.32 hours, resulting in a lodestar of $978,292.50. The total requested fee, therefore, yields a negative multiplier of 0.46.  Lead Counsel also underwrote expenses of $53,973.57 during the course of the Litigation.

46.     The efforts expended by Lead Counsel were extensive, time-consuming, challenging, and undertaken in the face of substantial risks. Lead Counsel believes the persistence and the quality of those efforts were responsible for the favorable result achieved in this case.

47.     Moreover, Lead Counsel has made every effort to operate as efficiently as possible and to avoid unnecessary fees and expenses.  Ultimately, the significant time and effort devoted to this case by Lead Counsel supports approval of the requested award.

### 1.  Risks of the Litigation

48.     As noted above, the Litigation was undertaken on a wholly contingent basis against a company with assets based entirely in China.  From the beginning, Lead Counsel understood that they were embarking on complex and expensive litigation with no guarantee of compensation for the investment of time, money, and effort that the case would require. It was unclear whether

Plaintiffs would overcome Defendants' anticipated motions to dismiss – much less survive summary judgment or *Daubert* motions, or prevail at trial or on any post-trial appeals.  It was also a considerable risk to undertake the Litigation in light of Defendants' locations in China and the possibility that Plaintiffs might be unable to enforce a judgment against Defendants.

49.     Indeed, this Litigation proved to be risky and difficult from its inception.  Plaintiffs were immediately faced with the challenge and uncertainty of conducting an investigation in China and having documents filed with Chinese regulators translated for purposes of review and consideration.  In addition, even the typically simple task of serving Defendants with the complaint and summonses was complicated by the individual defendants' unwillingness to permit counsel for China Valves to accept service on their behalf.  If was, therefore, left to Plaintiffs to file a motion and supporting memoranda requesting that Plaintiffs be authorized to serve the individual defendants located in China by means of substituted service of China Valves' defense counsel.

50.     Throughout the Litigation, Defendants, represented by a top-tier defense firm, Sidley Austin LLP, aggressively defended this case.   As discussed in the accompanying memoranda, Defendants argued, *inter alia*, that Defendants never made a material misrepresentation or omission, that Plaintiffs would not be able to prove that Defendants acted with fraudulent intent, and that Plaintiffs would not recover damages for the alleged Securities Act violation based on Defendants' affirmative defense of negative causation.

51.     Presenting these issues to a jury would have involved enormous risk.  Resolution of the damages, materiality, and causation issues alone would have required extensive analysis from experts and the adjudication of *Daubert* motions, and ultimately would have required a jury to assess the competing expert positions at trial. Presenting these issues to a jury would have involved enormous time, expense and complexity.

20

52.     Lead Counsel's financial investment in the litigation was considerable – and wholly at risk.  Frequently, plaintiffs' counsel take contingent cases such as this and, after expending thousands of hours and thousands of dollars out-of-pocket, receive nothing.  The risk of non-payment in complex cases such as this one is real.  Attorneys who specialize in contingent matters live in a world of uncertainty.  Even if a case is *en route* to success, unexpected evidence can be presented or there can be changes in the law through legislation or judicial decree that disrupt the successful progress of the pending action.   These are real threats.  The risks are considerably higher for cases against defendants who reside, and whose assets are located in, China.

53.     It takes hard and diligent work by skilled counsel to develop facts and theories that will succeed at trial or persuade defendants to enter into serious settlement negotiations. Securities class action lawsuits are also exceedingly expensive to litigate successfully.  While outsiders often focus on the aggregate fees awarded, they fail to take into consideration that those fees are used to fund enormous overhead expenses incurred during the course of litigation, are taxed by federal, state and local authorities, and, when reduced to the bottom line, are far less imposing to each individual involved than the aggregate fee awarded appears.

## 2. Quality of Representation

54.     Lead Counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions.  Lead Counsel have successfully represented investors in securities class actions and complex shareholder litigation across the country and have obtained significant settlements on behalf of their clients.  The identification and background of Federman & Sherwood and its attorneys is attached hereto as Exhibit 3.  The identification and background of The Ball Law Firm LLP and its attorneys is attached hereto as Exhibit 4.

55.     Lead Counsel's experience in the field allowed it to identify the complex issues involved in this case and to formulate strategies to effectively prosecute them.  Federman & Sherwood believes that its reputation as a firm with the demonstrated ability to vigorously develop the evidence in this case placed it in a strong position in settlement negotiations.

56.     The quality of opposing counsel is also significant in considering the quality of services rendered by plaintiffs' counsel.  Plaintiffs here were opposed in this case by very skilled and highly-respected counsel.  Defendants were represented by Sidley Austin LLP, which is among the top-tier defense firms in the country, with scores of attorneys in their litigation department alone.  Throughout the Litigation, Defendants' counsel litigated aggressively, and unfailingly.  They proved to be formidable adversaries who skillfully represented their clients.

### 3. Lack of Objections to the Fee Request

57.     As set forth above, more than 13,500 Notice Packets have been mailed to potential Class Members and nominees. *See* Chiango Affidavit (Ex. 1) at ¶ 10.  In addition, the Summary Notice was published in the national edition of *Investor's Business Daily*. *See id.* at ¶ 14. The Notices explain the Settlement and Lead Counsel's anticipated fee request.

58.     To date, the Parties have received no objections to the fee and expense application from Class Members.  The deadline for Class Members to file objections is August 5, 2014, pursuant to the Order Providing Notice.

59.     In sum, given the complexity and magnitude of the Litigation, the responsibility undertaken by Lead Counsel, the difficulty of proof of liability and damages, the experience of Lead Counsel and defense counsel, and the contingent nature of Lead Counsel's agreement to prosecute this Litigation, Lead Counsel respectfully submit that the requested attorneys' fees are reasonable and should be approved.

**B.  Reimbursement of Litigation Expenses**

60.     Lead Counsel are also requesting reimbursement of the out-of-pocket expenses necessarily incurred and advanced by Lead Counsel in the prosecution of the Litigation in the amount of $53,973.57.

61.     The chart below details the expenses Lead Counsel collectively incurred and underwrote during this period and summarizes the expenses incurred by category.

| DISBURSEMENT | TOTAL |
|---|---|
| Meals, Hotels & Transportation | $14,911.48 |
| Photocopies | $614.00 |
| Postage | $10.47 |
| Investigation | $14,473.50 |
| Messenger, Overnight Delivery | $744.30 |
| Filing, Witness & Other Fees | $127.00 |
| Lexis, Westlaw, Online Library Research | $13,947.82 |
| Mediation Fees | $4,775.00 |
| Experts/Consultants | $4,370.00 |
|  |  |
| **TOTAL:** | **$53,973.57** |

62.     The expenses incurred in this Litigation are reflected in the books and records of Lead Counsel. These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred.

63.     The expenses incurred by Lead Counsel were necessary and appropriate for the prosecution of this Litigation.  As demonstrated in the above chart, Lead Counsel collectively incurred expenses of $53,973.57, all of which was at risk in this litigation.  This amount includes the fees and expenses of experts and independent service providers, whose services Lead Counsel required to successfully prosecute and resolve this case against Defendants.  Lead Counsel also incurred significant expenses for electronic storage, photocopying, imaging and electronic management of hundreds of thousands of pages of documents, and online factual and legal research.  These expenses are a necessary part of litigation of this magnitude and scale and were

essential to enable Lead Counsel to achieve the results now before the Court – the $1.5 million Settlement.

### C. The Requested Reimbursement Awards to Plaintiffs is Reasonable and Fair

64.     Lead Plaintiff and Class Representative Bristol Investment seeks a reimbursement award of $3,500 for its lost time and efforts in the prosecution and oversight of the Litigation on behalf of the Class.  *See* Exhibit 5, attached hereto.  Named plaintiff and Class Representative Joseph Gibbons seeks a reimbursement award of $1,500 for his lost time and efforts in the prosecution and oversight of the Litigation on behalf of the Class.  *See* Exhibit 6, attached hereto. The different reimbursement requests reflect the varying levels of time expended and oversight provided in the prosecution of the Litigation.  The requested amounts of $3,500 and $1,500 are reasonable and well within the range of awards typically granted by courts in this Circuit.  Plaintiffs have submitted detailed declarations setting forth their respective levels of participation in the Litigation.  *See* Exhibits 5 and 6, attached hereto.

65.     Plaintiffs were provided and reviewed the numerous pleadings and filings in this Litigation, and discussed with Lead Counsel the filings, case strategies, and settlement.  *See id.* Plaintiffs conducted numerous telephone conferences and email exchanges with their Lead Counsel in connection with their respective oversight and prosecution of this Litigation, including Settlement negotiations.  *Id.*  In the opinion of Lead Counsel, Plaintiffs' active participation and efforts expended in prosecuting this Litigation have materially aided the efficient Settlement achieved in this Litigation.

66.     The amounts requested are reasonable in light of Plaintiffs' substantial contributions to the Litigation.  The reasonableness of the requested awards is further evidenced

by the fact that not a single Class Member has objected to the awards, even though the Notice advised that such awards would be sought. *See* Chiango Affidavit at ¶ 15.

## VII.   REACTION OF THE CLASS SUPPORTS APPROVAL OF THE SETTLEMENT

67.   To date, no Class Member has come forward to object to any aspect of the Settlement, Plan of Allocation, the Notice, request for attorneys' fees and expenses, or the reimbursement award to Plaintiffs. *Id.* Moreover, not a single Class Member out of more than 13,500 investors and nominees who were mailed a copy of the Notice have sought exclusion from the Class. *Id.*

68.   Because the proposed Settlement has been overwhelmingly accepted by the members of the Class, this factor weighs heavily in favor of approving the Settlement, the Plan of Allocation, the request for attorneys' fees and expenses, and the reimbursement award to Plaintiffs.

## VIII.  CONCLUSION

69.   The Settlement represents a favorable result for the Class in a complicated case fraught with risk. For the reasons set forth above and in the accompanying memoranda, Lead Counsel respectfully submit that the Settlement, Plan of Allocation, application for an award of attorneys' fees and reimbursement of expenses, and application for reimbursement awards for Plaintiffs should be approved as fair, reasonable and adequate.

Executed this 5th day of August, 2014

  /s/William B. Federman
  William B. Federman

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2014 this Declaration was filed through the ECF system and will be sent electronically to the registered participants of the Court's CM/ECF system.

/s/ William B. Federman
William B. Federman